## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIAN
## SOUTHERN DIVISION

Karlynne Tucker-Scaggs,

     Plaintiff,

  v.

Volunteers of America, Inc., a New York Non-Profit Corporation, and William Brett,

Jointly and Individually,

     Defendants.

Case No.

Hon.

## COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiff Karlynne Tucker-Scaggs complains of defendants Volunteers of America, Inc. ("VOA") and William Brett ("Brett"), as follows:

## PARTIES, JURISDICTION AND VENUE

1.     Karlynne Tucker-Scaggs is a resident of Southfield, Michigan.

2.     Volunteers of America, Inc. is a New York Corporation, registered to do business in Michigan, and its principal offices in Virginia.

3.     William "Bill" Brett Vice President of VOA National Housing, is a resident of Westerville, Ohio.

1

4.     Key events involved in this matter occurred in the Eastern District of Michigan; therefore, venue is appropriate in this Court.

5.     This Court has subject matter jurisdiction over Plaintiff's claim under 42 U.S.C. §§ 1981, 1981a, and 1988 pursuant to 28 U.S.C. § 1331.

6.     This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367, as the facts related to these claims form the same case as the federal-law claims.

## STATEMENT OF FACTS

7.     Karlynne Tucker-Scaggs is a 60-year-old African American woman.

8.     Tucker-Scaggs has a long and successful career in real estate and property management.

9.     Tucker-Scaggs worked from 2009 to 2017 directing real estate and property management at the Michigan affiliate of Volunteers of America.

10.     In 2017, Tucker-Scaggs was promoted to Director of Operations, VOA National Housing Corporation.

11.     In this position, she worked from an office space rented by VOA and located in Southfield, Michigan.

12.     Tucker-Scaggs reported to Bill Brett, the Vice President of VOA National Housing Corporation.

13.     Tucker-Scaggs is known by her colleagues and her direct reports as a highly professional and knowledgeable leader who produces excellent work while also supporting her team.

14.     Brett began working at VOA in 2016 and split his work time between his home in Westerville, Ohio and the VOA headquarters in Alexandria, Virginia.

15.     On November 14, 2018, during a conference call with Brett and several other members of the National Housing Corporation team, Brett addressed Tucker-Scaggs harshly on an issue regarding resident certifications and said, "this is what lead up to your predecessor's demise, and I don't want to have to whip anyone or tan their hides."

16.     Tucker-Scaggs found this comment racially charged, violent and harassing to her.

17.     Then Tucker-Scaggs had a conversation on November 15, 2018 with Brett in which she also felt harassed and mistreated.

18.     On November 15, 2018, Tucker-Scaggs called Executive VP of Human Resources Jane Cohen and informed her about Brett's comments at the November 14, 2018 meeting and the subsequent interaction with him that had left her quite concerned about her job security.

19.   On November 16, 2018, Tucker-Scaggs contacted the VOA employee hotline to report her concerns that Brett had made racially offensive comments to her and threatened her job.

20.   In her complaint, Tucker-Scaggs explained that she believed the language of "whipping" and "tanning hides" was evocative of slavery.

21.   Also in November of 2018, at a senior leadership dinner hosted by Patrick Sheridan, Executive Vice President for Housing, Brett was overheard by several others to say, "my son is so good at athletics that I should check with my wife to see if my son has nigger-blood in him."

22.   It is believed that at least one person who heard this comment was so offended that they reported the comment to VOA Human Resources shortly after this event.

23.   Late in 2018, Tucker-Scaggs had an opening to fill for a Regional Housing Manager, who would report directly to her.

24.   Tucker-Scaggs and Brett interviewed three final candidates for this position.

25.   Brett informed Tucker-Scaggs that since the position was in her department, the final decision would be hers to make.

26.     On or about December 10, 2018, Tucker-Scaggs informed Brett in a phone conversation that she had selected a candidate who in her estimation had the best experience and qualifications.

27.     This candidate Tucker-Scaggs selected is a Latina woman.

28.     Brett responded that he did not approve of this candidate because he said that "he could not understand her accent" and vetoed this candidate's hiring.

29.     Tucker-Scaggs was appalled at this response, finding that Brett had demonstrated with his statement and veto of her hiring a clear racial animus against stronger candidate because she was a Latina.

30.     Tucker-Scaggs reported her concerns about Brett's racism in this hiring incident to Adrienne Holland, Recruiter and HR en  eralist for VOA.

31.     On December 12, 2018, when Tucker-Scaggs was working at the headquarters in Virginia, she reported her concern about Brett's racial bias in this hiring decision to VP of Diversity and Inclusion, Rhonda Mower.

32.     Mower took no action in response to Tucker-Scaggs' report.

33.     Also on December 12, 2018, Brett and Tucker-Scaggs met together with Brett's boss, Patrick Sheridan, the Executive Vice President for Housing.

34.     At this meeting, Sheridan expressed his concern that there were communication problems between Brett and Tucker-Scaggs that needed to be

5

resolved—suggesting that he was meeting with them because of the complaint Tucker-Scaggs made to the employee hotline.

35.    When Sheridan left the meeting, Brett leaned across at Tucker-Scaggs and asked her, "Did you think that going to HR with a complaint would save your job? We are an at-will company and if I want you gone, you'll be gone."

36.    Brett added that for the moment, Tucker-Scaggs served his purposes, so that he did not want her gone then, but that she had best remember that it was his department not hers.

37.    Brett instructed Tucker-Scaggs to "think about things" over the Christmas holiday.

38.    On January 2, 2019, Tucker-Scaggs reported to Director of Human Resources Lisa Bury that she was concerned that Brett was retaliating against her for making her report to the VOA employee hotline.

39.    On January 23, 2019, Brett in a meeting that included Tucker-Scaggs, spoke to her very disrespectfully and accused her and a colleague of dishonesty in their work.

40.    On February 5, 2019, at an organization-wide meeting in California, Tucker-Scaggs shared her concerns with Executive VP of National

Services and COO Sharon Wilson éno that Brett was harassing her and retaliating against her.

41.     On February 8, 2019, Tucker-Scaggs emailed Wilson éno asking that a third party be present when she met one-on-one with Brett.

42.     On February 10, 2019, Tucker-Scaggs sent Sheridan an email expressing further concerns about the hostile workplace and her concerns that Brett was bullying her in retaliation for having contacted the employee hotline.

43.     On February 11, 2019, Sheridan called Tucker-Scaggs saying that VOA did not tolerate retaliation and asking her to "hang in there."

44.     Sheridan also informed Tucker-Scaggs that he was referring the matter to Human Resources.

45.     On February 18, 2019, Sheridan emailed Tucker-Scaggs confirming that he and Wilson éno had referred her concerns to Human Resources.

46.     On March 12, 2019, Brett harassed Tucker-Scaggs over her trip expenses for the California meeting, even though her receipts were all in order and legitimate.

47.   On March13, 2019, Tucker-Scaggs asked Director of Human Resources Sylvia Compito whether her hotline complaint from November 16, 2018 had been investigated, as she had not received any follow up.

48.   Compito responded with an email saying that the investigation had been conducted and closed.

49.   Tucker-Scaggs was very concerned that there had not been an investigation, because none of the witnesses to these incidents had been contacted.

50.   On March 21, 2019, Compito informed Tucker-Scaggs that she and Brett would be given "360-Degree Reviews" by an outside company.

51.   Compito denied that this was because of the complaint Tucker-Scaggs had made.

52.   To Tucker-Scaggs' knowledge, no other VOA managers were asked to conduct a 360-Degree reviews.

53.   On April 4, 2019, Cohen wrote to inform Tucker-Scaggs that her employee complaint had been investigated and was considered closed.

54.   Also on April 4, 2019, Tucker-Scaggs called Compito to inquire whether the 360-degree review had been completed.

55.   On April 9, 2019, Brett yelled and berated Tucker-Scaggs on a business call.

56.    In response to this call, Tucker-Scaggs wrote to Brett, cc'ing Sheridan, Cohen, and Compito, explaining why she thought he had been inappropriate on that phone call and asking for a meeting with Sheridan and Brett.

57.    In a separate email, Tucker-Scaggs asked Compito, Cohen, and Sheridan for an opportunity to discuss her job duties and her ongoing concerns that Brett is bullying her because she made a complaint to the employee hotline.

58.    Tucker-Scaggs also requested that a third party participate in her upcoming performance review, as she was concerned that Brett would not give her a fair assessment.

59.    On April 17, 2019, Tucker-Scaggs wrote to Compito, Cohen, and Sheridan, explaining that Brett had not agreed to have their department's administrator participate in their meetings for her safety and to calm her anxiety regarding his bullying.

60.    Tucker-Scaggs further informed them in writing that Brett's hostility towards her was affecting "my self-esteem, my productivity, my sleep, my appetite, my health" and that she was finding the workplace environment unacceptably hostile.

61.   On April 23, 2019, when Tucker-Scaggs was working in Alexandria, Robert ibson, Executive Vice President and Chief of Staff for VOA invited her to breakfast to check in on "how she was really doing."

62.   ibson and Tucker -Scaggs had worked together when she was still at VOA's Michigan affiliate and he was the VP for housing.

63.   At this breakfast, Tucker-Scaggs shared with ibson the events and incidents described herein, including both the racially biased comments Brett had made, his threats and harassment of her in retaliation for reporting her concerns, and the indifference of the VOA leadership to her concerns.

64.   ibson informed her that he was "appalled" and "very disappointed" and he encouraged her to speak openly and honestly with Wilson éno when she met with her the next day.

65.    On April 24, 2019, Tucker-Scaggs met with Brett, Wilson  éno and Sheridan.

66.   At this meeting, Tucker-Scaggs was told that she should "really think about" whether she wished to persist in lodging accusations against Brett, because it would misuse the VOA's resources to have to conduct an investigation.

67.     At this meeting, Tucker-Scaggs reiterated her concerns that Brett had demonstrated racial animus in hiring a lesser qualified white woman over a more qualified Latina.

68.     At this meeting, Tucker-Scaggs was presented with a task list of ten new projects that she had to complete within 60 days.

69.     Tucker-Scaggs completed all of these assigned tasks in advance of each due date.

70.     On June 1, 2019, VOA hired a team-building consultant to meet with Brett and 6 of his direct reports, including Tucker-Scaggs.

71.     At one point during this session, when Brett left the room, three members of the team—not Tucker-Scaggs—explained to the consultant that they could not be forthcoming in the meeting for fear of reprisals and retaliation from Brett.

72.     Throughout this time period, Tucker-Scaggs has experienced increasing emotional distress, heightened anxiety, loss of sleep, and stomach pain, as well as diminution of her professional esteem from the treatment she has received from Brett and the VOA executives who have supported and tolerated his retaliation against her for reporting her concerns about race discrimination.

73.     On July 8, 2019, Tucker-Scaggs began a medical leave of absence to seek treatment and recovery from the immense emotional and physical distress she has been suffering from Brett's hostile treatment.

74.     On September 27, 2019, Tucker-Scaggs provided VOA with a resignation letter explaining that her physician and psychotherapist had each informed her that they would not condone her return to work given the abuse and hostility she had experienced from Brett and the lack of support she was receiving from the VOA executives regarding her concerns.

75.     Tucker-Scaggs explained in her resignation letter that both her physician and psychotherapist felt it would be far too dangerous to Tucker-Scaggs's health and well-being to be exposed again to Brett's bullying and harassment of her.

76.     As a result of Brett's hostile, abusive treatment of Tucker-Scaggs in retaliation for her exercising her rights to oppose racial discrimination and racially hostile language in the workplace, Tucker-Scaggs has been denied her employment at VOA.

## COUNT I: RETALIATION IN VIOLATION OF 42 U.S.C. §§ 1981, 1981a

77.     Plaintiff incorporates the above allegations by reference here.

78.     42 U.S.C. § 1981 guarantees all person within the United States the equal right to make and enforce contracts, including employment relationships, regardless of race.

79.     It is also unlawful to retaliate against and employees who seek to exercise their rights under 42 U.S.C. § 1981. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008).

80.     Tucker-Scaggs exercised her rights under 42 U.S.C. § 1981 by reporting to human resources that Brett had demonstrated racial bias in a hiring decision and by reporting to the VOA employee hotline that she believed Brett was expressing racial hostility towards her in the workplace.

81.     Brett directly threatened Tucker-Scaggs that he would and could have her terminated because she reported him to human resources.

82.     Brett's treatment of Tucker-Scaggs became even more hostile after she made her complaint to the employee hotline.

83.     When Tucker-Scaggs sought the intervention of VOA senior executives and human resources leadership because of the hostile treatment she was receiving in retaliation for her complaint, they supported Brett and imposed ultimatum assignments on her, rather than taking actions to end Brett's the unlawful conduct.

84.    Brett deliberately created intolerable working conditions for Tucker-Scaggs by threatening her job and by yelling at her and harassing her for no legitimate reason in front of colleagues after she reported her concerns about his racial bias to Human Resources.

85.    VOA deliberately created intolerable working conditions for Tucker-Scaggs by failing to conduct any meaningful investigation of her report that Brett exhibited racial bias toward her and others and by failing to address her repeated concerns that she was facing retaliation in the form of threats to her job, hostility, bullying, and harassment from Brett.

86.    Ultimately, Brett's persistent hostility and harassment, combined with the VOA leadership's knowing support for his conduct, has caused Tucker-Scaggs to suffer intense emotional and physical distress.

87.    Brett's treatment of Tucker-Scaggs, combined with the VOA leadership's knowing support for his conduct, caused Tucker-Scaggs to suffer such extreme psychological and physical pain that she has needed to take an extended medical leave from her employment.

88.    Finally, Tucker-Scaggs had no choice but to resign her employment from VOA on the advice of her healthcare providers who determined it would be far too dangerous to her health and wellbeing to be subjected again to Brett's hostility and harassment of her.

## A.     Relief Sought

Accordingly, Tucker-Scaggs seeks all remedies and relief provided by 42 U.S.C. §§ 1981a and 1988, including:

A.     Damages equivalent to the wages, bonuses, fringe benefits and other lost compensation, both past and future, as well as the accrued interest on same;

B.     Compensatory damages for the emotional distress, pain and suffering, and harm to reputation, caused by Brett and VOA's racial discrimination and retaliation;

C.     Punitive damages for the willful, intentional discrimination she experienced from Parish; and

D.     Reasonable attorney's fees, including costs.

## COUNT II: VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

89.     Plaintiff incorporates by reference all of the allegations contained above as stated in full herein.

90.     The ELCRA, M.C.L. § 37.2202(1), prohibits discrimination in the workplace because of an individual's race.

91.    The ELCRA, M.C.L. § 37.2701, further prohibits retaliation, intimidation, or threatening an individual who has sought to exercise her rights under the act or opposed a violation of the act.

92.    Tucker-Scaggs exercised her rights under the ELCRA by reporting to human resources that Brett had demonstrated racial bias in a hiring decision and by reporting to the VOA employee hotline that she believed Brett was expressing racial hostility towards her in the workplace.

93.    Brett directly threatened Tucker-Scaggs that he would and could have her terminated because she reported him to human resources.

94.    Brett's treatment of Tucker-Scaggs became even more hostile after she made her complaint to the employee hotline.

95.    When Tucker-Scaggs sought the intervention of VOA senior executives and human resources leadership because of the hostile treatment she was receiving in retaliation for her complaint, they supported Brett and imposed ultimatum assignments on her, rather than taking actions to end Brett's the unlawful conduct. Brett deliberately created intolerable working conditions for Tucker-Scaggs by threatening her job and by yelling at her and harassing her for no legitimate reason in front of colleagues after she reported her concerns about his racial bias to Human Resources.

96.     VOA deliberately created intolerable working conditions for Tucker-Scaggs by failing to conduct any meaningful investigation of her report that Brett exhibited racial bias toward her and others and by failing to address her repeated concerns that she was facing retaliation in the form of threats to her job, hostility, bullying, and harassment from Brett.

97.     Ultimately, Brett's persistent hostility and harassment, combined with the VOA leadership's knowing support for his conduct, has caused Tucker-Scaggs to suffer intense emotional and physical distress.

98.     Brett's treatment of Tucker-Scaggs, combined with the VOA leadership's knowing support for his conduct, caused Tucker-Scaggs to suffer such extreme psychological and physical pain that she has needed to take an extended medical leave from her employment.

99.     Finally, Tucker-Scaggs had no choice but to resign her employment from VOA on the advice of her healthcare providers who determined it would be far too dangerous to her health and wellbeing to be subjected again to Brett's hostility and harassment of her.

## RELIEF SOUGHT

WHEREAS, Tucker-Scaggs has suffered severe emotional distress with physical pain from Defendants' actions, Plaintiff seeks the following relief available under M.C.L. §§ 37.3801-02:

A.      Compensatory and damages for economic and non-economic losses both past and into the future;

B.      Reasonable attorney's fees, costs of litigation, and interest on any judgment;  and

C.      Any further relief as the Court deems appropriate.


Respectfully submitted by:

Pitt McGehee Palmer & Rivers, PC

By: /s/*Robin B. Wagner*_____
Michael L. Pitt P24429
Robin B. Wagner P79408
117 W. Fourth Street
Suite 200
Royal Oak, MI 48067
248-398-9800
mpitt@pittlawpc.com
rwagner@pittlawpc.com

Dated: October 10, 2019

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| Karlynne Tucker-Scaggs, | Case No. |
| Plaintiff, | |
| v. | Hon. |
| Volunteers of America, Inc., a New York Non-Profit Corporation, and William Brett, | |
| Jointly and Individually, | |
| Defendants. | |

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of the facts and issues involved in this matter.

Respectfully submitted by:

Pitt McGehee Palmer & Rivers, PC
By: _/s/ *Robin B. Wagner*_____
Michael L. Pitt P24429
Robin B. Wagner P79408
117 W. Fourth Street
Suite 200
Royal Oak, MI 48067
248-398-9800
mpitt@pittlawpc.com
rwagner@pittlawpc.com

Dated: October 10, 2019